UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KAYE C.,**[1]

    **Plaintiff,**

v.

Case No. 3:21-cv-00164
Magistrate Judge Norah McCann King

**COMMISSIONER OF SOCIAL SECURITY,**[2]

    **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Kaye C. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying those applications. This matter is now before the Court, with the consent of the parties, *see Joint Consent of the Parties*, ECF No. 5, on *Plaintiff's Statement of Errors*, ECF No. 9, *Defendant's Memorandum in Opposition*, ECF No. 14, *Plaintiff's Reply*, ECF No. 15, and the *Certified Administrative Record*, ECF No. 8. After careful consideration of the entire record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court denies *Plaintiff's Statement of Errors* and affirms the Commissioner's decision.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* S.D. Ohio General Order 22-01.
[2] Kilolo Kijakazi is the Acting Commissioner of Social Security. *See* Fed. R. Civ. P. 25(d).

1

I.     PROCEDURAL HISTORY

Plaintiff protectively filed her applications for disability insurance benefits and supplemental security income on September 21, 2018, alleging that she has been disabled since September 19, 2017, based on both physical and mental impairments. R. 201-04, 205-10.[3] The applications were denied initially and upon reconsideration and Plaintiff requested a *de novo* hearing before an administrative law judge. R. 143-44. Administrative Law Judge ("ALJ") Gregory Kenyon held a hearing on April 21, 2020, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R. 32-59. In a decision dated May 18, 2020, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from September 19, 2017, Plaintiff's alleged disability onset date, through the date of that decision. R. 12-25. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on April 16, 2021. R. 1-6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On March 22, 2022, the case was reassigned to the undersigned. ECF No. 12. The matter is ripe for disposition.

II.     LEGAL STANDARD

     A.     Standard of Review

In reviewing applications for Social Security disability benefits, "[t]he Commissioner's conclusion will be affirmed absent a determination that the ALJ failed to apply the correct legal standard or made fact findings unsupported by substantial evidence in the record." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). The United States Supreme Court has explained the

---

[3] References to pages as they appear in the Certified Administrative Record will be cited as "R. __."

substantial evidence standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted). In addition, "'[w]here substantial evidence supports the [Commissioner's] determination, it is conclusive, even if substantial evidence also supports the opposite conclusion.'" *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020) (quoting *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)); *see also Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### B. Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The claimant bears the burden of proof through step four; at step

3

five, the burden shifts to the Commissioner." *Rabbers*, 582 F.3d at 652 (*citing Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at §§ 404.1509, 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines that the

plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

### III.  ALJ DECISION AND APPELLATE ISSUES

The Plaintiff was 44 years old on September 19, 2017, her alleged disability onset date. R. 24. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between that date and the date of the decision. R. 15.

At step two, the ALJ found that Plaintiff's lumbar degenerative disc disease; chronic obstructive pulmonary disease ("COPD"); anxiety disorder; and depression were severe impairments. *Id.*

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 19.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: (1) occasional crouching, crawling, kneeling, stooping, balancing, and climbing ramps and stairs; (2) never climbing ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no concentrated exposure to temperature extremes or respiratory irritants; (5) limited to performing simple, repetitive tasks with an SVP of 1 or 2; (6) occasional superficial contact with coworkers and supervisors (superficial contact is defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals, but as lacking the ability to engage in more complex social interactions such as persuading other people or resolving interpersonal conflicts); (7) no public contact; (8) no fast-paced production work or jobs which involve strict production quotas; and; (9) limited to performing jobs which involve very little, if any, change in the job duties or the work routine from one day to the next.

R. 20. The ALJ also found that this RFC did not permit the performance of Plaintiff's past

relevant work as a medical assistant, stocker/cashier, and laborer. R. 24.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs—*i.e.*, approximately 200,000 jobs as a housekeeping cleaner; approximately 50,000 jobs as a folder; approximately 100,000 jobs as an inspector—existed in the national economy and could be performed by Plaintiff. R. 25. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from September 19, 2017, her alleged disability onset date, through the date of the decision. *Id*.

Plaintiff disagrees with the ALJ's findings and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits. *Plaintiff's Statement of Errors,* ECF No. 9; *Plaintiff's Reply Brief*, ECF No. 15. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Memorandum in Opposition,* ECF No. 14.

## IV. RELEVANT EVIDENCE

Plaintiff testified that she has problems with her mid- and lower-back and that the problems have worsened over the years. R. 40. Her back pain, which is constant and severe, radiates into her left leg and results in numbness, burning, and tingling. R. 40, 42. Her leg also gives out and, as a result, she uses a walker. R. 42. She had been referred to a spinal surgeon, who suggested that she first pursue physical therapy. R. 43.

Plaintiff also suffers from depression and anxiety. R. 45. She isolates herself from others. R. 45-46. She has difficulty in crowds. R. 52. She does not leave her home except to attend weekly doctors' appointments. R. 46. She spends most days in bed. R. 47. Plaintiff also has

difficulty with concentration, crying spells, and anger. R. 47-48. She has attempted suicide on two occasions and continues to have suicidal ideation. R. 49. She specifically testified that she sees a counselor once a week and had been doing so for about a year at the time of the hearing. R. 50.

In December 2018, Richard Sexton, Ph.D., consultatively examined Plaintiff on referral by the state agency. R. 365-372. Plaintiff reported a history of mood swings, poor sleep, lack of energy, and panic attacks. R. 367. She also discussed her hospitalizations. *Id*. On clinical examination, Dr. Sexton noted that Plaintiff appeared anxious and depressed and that her affect was flat. R. 368. Dr. Sexton diagnosed depression and anxiety. R. 369. He commented that Plaintiff would have some difficulties in social functioning within the workplace. R. 371. In assessing Plaintiff's ability to engage in work-related activities, Dr. Sexton opined that Plaintiff would be able to understand and apply instructions in the work setting "consistent with low average intellectual functioning," *id*., she demonstrated only "slight difficulty meataining attention/concerntration and a task focus in performing simple as well as multi-step tasks" during the examination, *id*., she established a "fair relationship" with Dr. Sexton, who found "[s]ome limitations in Plaintiff's ability to conform to social expectations in a work setting," *id*., and she would "have difficulties responding appropriately to work-place pressures," R. 372.

The ALJ found Dr. Sexton's opinion "only partially persuasive":

Based on his examination, Dr. Sexton diagnosed depression and anxiety. He noted some deficits in social functioning in that the claimant reported prior difficulties getting along with others in the workplace. However, the claimant was able to relate well during the examination and was cooperative with no abnormalities of behavior. Treatment records also describe her mood and affect as normal, overall. Thus, the claimant's capacity to conform to social expectations and interact appropriately seem to be plainly within her control. Dr. Sexton also indicated that the claimant would have difficulty coping with work stress. But, his mental status examination of the claimant was largely normal. Further, the claimant has not required a high level of mental health care. Thus, Dr. Sexton's comments in this

> respect seem to be based upon an uncritical acceptance of the claimant's subjective complaints, and his opinion evidence is only partially persuasive.

R. 17 (citations to record omitted).

Darrell Snyder, Ph.D., conducted a psychological review of the record on behalf of the state agency in December 2018. R. 69-71. Dr. Snyder opined that Plaintiff could understand, remember, and follow three-step instructions. R. 70. She would be moderately limited in her ability to carry out detailed instructions, maintain attention, and work in coordination with others without becoming distracted. *Id*. She was moderately limited in her ability to complete a normal workday and week without interruption. *Id*. She was mildly limited in her ability to respond to changes in the workplace. R. 71. According to Dr. Snyder, Plaintiff should be limited to superficial interaction with others in a static setting. *Id*. In April 2019, Lisa Foulk, Psy.D., reviewed the record on reconsideration for the state agency and affirmed Dr. Snyder's opinions. R. 99-101.

> The ALJ found the opinions of Drs. Snyder and Foulk "substantially persuasive":
>
> Psychologist Darrell Snyder, Ph.D., evaluated the claimant's mental condition on December 29, 2018 on behalf of the DDD based on the evidence of record without examining the claimant. DDD psychologist, Lisa Foulk, Psy.D., evaluated the claimant's mental condition on reconsideration on April 15, 2019. In the opinion of both Drs. Snyder and Foulk, the claimant has "severe" mental impairments of depression and anxiety. They concluded that the claimant experiences a moderate limitation in her ability to interact with others, understand, remember, or apply information, concentrate, persist, or maintain pace, and adapt or manage oneself. Drs. Snyder and Foulk restricted the claimant to routine 1-3 step tasks without production or time requirements in a relatively static setting allowing for superficial interactions with others which has been interpreted as simple, repetitive tasks free of fast-paced production requirements, little workplace change, and no more than occasional, superficial social contacts with supervisors and coworkers. The assessments of the DDD reviewing psychologists are substantially persuasive. When considered together, these restrictions (included in the residual functional capacity discussed below) are sufficient to ensure that any tasks the claimant would be compelled to have as part of her actual job duties fully accommodate any difficulties with interpersonal nuance, cognitive deficits, and stress tolerance that the claimant might experience.

8

R. 17 (citations to record omitted).

Catherine Gillson, MS Ed., LPCC, Plaintiff's mental health counselor, completed a mental health impairment questionnaire in March 2020. R. 531-533. At the time, Ms. Gillson had been seeing Plaintiff for eight months. R. 531. Ms. Gillson noted that Plaintiff suffered from sleep disturbance, mood disturbance, social isolation, flat affect, decreased energy, loss of interests, anxiety, feelings of worthlessness, and difficulty concentrating. *Id*. She opined that Plaintiff would be off task for 15 percent of the work week and would miss work up to three times per month. *Id.* According to Ms. Gillson, Plaintiff was moderately limited in her ability to learn and apply information, cooperate with others, focus and stay on task, adapt to changes in the work setting, and work with others without distracting them. R. 532-33. She was markedly limited in her ability to regulate emotions, control her behavior, and maintain wellbeing in the workplace. R. 533. She was extremely limited in her ability to manage her psychologically based symptoms and to maintain her personal hygiene. R. 532. However, Ms. Gillson also indicated that Plaintiff could "perform regular, full-time, competitive work (including jobs consisting of simple, routine tasks) on a sustained basis without missing work more than two times per month, being off-task more than 15% of the workday, or needing additional breaks due to" either her impairments, medical appointments, or treatments. R. 533.

The ALJ found Ms. Gillson's opinion "not persuasive":

> However, a review of the claimant's treatment records does not support the level of limitation alleged in this opinion evidence which, therefore, is not persuasive. The claimant was psychiatrically hospitalized, but her mental health has stabilized since that time and the minimal level of mental health treatment she has had since then does not show evidence of the type of debilitating anxiety or depressive symptoms that Ms. Gillison [sic] alleges. . . .

R. 16.

Turning to opinions regarding Plaintiff's physical impairments, Venkatachala Sreenivas, M.D., reviewed the record on behalf of the state agency in November 2018. R. 68-69. Dr. Sreenivas considered Listing 1.04, which addresses disorders of the spine, but opined that Plaintiff could lift or carry 20 pounds occasionally and ten pounds frequently. R. 68. She could sit, stand, or walk for about six hours during the workday and was unlimited in her ability to push or pull. *Id.* Plaintiff could occasionally climb ramps and stairs, as well as stoop and crawl. R. 68-69. She could frequently kneel and crouch, and was unlimited in her ability to balance. R. 68-69. She could never climb ropes, ladders, or scaffolds. R. 68. In addressing Plaintiff's postural limitations, Dr. Sreenivas noted limitations due to pain in the lumbar spine. R. 69. On reconsideration in April 2019, Leigh Thomas, M.D., also considered Listing 1.04 and affirmed Dr. Sreenivas's findings and conclusions. R. 98-99.

Marquetta Colbert, CNP, Plaintiff's primary care provider, opined in July 2019 that Plaintiff "may use ambulatory aids such as cane or walker or crutches" to "[p]rotect joints from overuse." R. 406.

The ALJ found the opinions of Dr. Sreenivas and Dr. Thomas "persuasive" but found Nurse Colbert's opinion "not persuasive":

> The assessments provided by the DDD reviewing physicians, describe an underlying capacity for light exertion, and are persuasive. By definition, light work involves lifting as much as 20 pounds occasionally and 10 pounds frequently. Light work can require standing and walking as much as 6 hours during any given 8-hour workday. It may involve occasional stooping. Light work may require upper extremity use for grasping, holding, and turning objects (20 CFR 404.1567(b)) and 416.967(b). Imaging evidence of record does show "severe" degenerative changes of the lumbar spine but those same studies show no evidence of nerve root compression or other neurological involvement. The overall objective evidence does not show the claimant's mobility is so significantly affected that she lacks the ability to stand and walk for sufficient periods to perform light work. The claimant's primary care provider, Marquetta Colbert, CNP, noted that she "may" use ambulatory aids such as a cane, walker, or crutches which certainly is not an indication that the use of an ambulatory aid is medically necessary. Therefore, these

>  comments are not persuasive and it is found that limiting the claimant to light work is the most plausible estimation of her physical capabilities. Drs. Sreenivas and Thomas also included postural limitations which the undersigned has extended to reasonably account for any potential back pain: the claimant can climb ramps and stairs, crouch, crawl, kneel, stoop, and balance no more than occasionally. She can never climb ladders, ropes, and scaffolds. For safety considerations, she should not be expected to perform work around hazards such as unprotected heights or dangerous machinery. COPD symptoms seem very mild, but to prevent symptom exacerbation the claimant can have only concentrated exposure to temperature extremes and respiratory irritants.

R. 21-22.

V. **DISCUSSION**

    A. **Evaluation of Opinion Evidence**

Plaintiff disagrees with the ALJ's evaluation of these medical opinions and asks that the decision be reversed and remanded for an award of benefits. This Court disagrees.

For claims such as Plaintiff's, *i.e.,* those filed after March 27, 2017,[4] the regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. §§ 404.1527, 416.927 *with* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Instead, the Commissioner will consider the following factors when considering all medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating examination, the frequency of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5) other factors, including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in

---

[4] As noted above, Plaintiff filed her applications on September 21, 2018.

the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

The regulations emphasize that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. at §§ 404.1520c(a), 416.920c(a). As to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. §§ 404.1520c(c)(2), 416.920c(c)(2). The applicable regulations further require the ALJ to articulate his "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive he find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. at §§ 404.1520c(b), 416.920c(b). Specifically, the ALJ must explain how he considered the 'supportability' and 'consistency' factors for a medical source's opinion and ALJ may—but is not required to—explain how he considered the remaining factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). However, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each

12

determination or decision how he considered all of the factors for all of the medical opinions and prior administrative medical findings in [the claimant's] case record." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).

Plaintiff contends that the ALJ's evaluation of the opinion evidence in this caser failed to comply with the governing regulations and standards, was inconsistent with the evidence, and improperly ignored contrary evidence. This Court disagrees.

A fair reading of the ALJ's decision as a whole makes clear that the ALJ complied with the governing regulations and that his evaluation of the opinions relating to Plaintiff's mental impairments enjoys substantial support in the record:

> Other records relate to the claimant's allegations of anxiety and depression. She was hospitalized in September 2017, near the time of the alleged onset date, for worsening depression and suicidal ideation related to a 10-year heroin addiction. The claimant had also just lost her job at the time. She was treated for opiate withdrawal and was also given medication for controlling mood which stabilized the claimant's symptoms at the time of discharge. The claimant was again hospitalized in February 2018 when she endorsed the same symptoms of depression and opiate use. A similar course of treatment was administered, and again, the claimant' symptoms improved. At the time of discharge, she was "visible," "social" and "back to baseline".
>
> The claimant has since received little mental health treatment. Psychotropic medication was prescribed by her primary care provider, and the claimant was seen at Mahajan Therapeutics during July and August 2019. Therapy and medication management were recommended. Those treatment notes reflect moderate-level symptoms such as unstable mood, low motivation, sleep disturbances, crying spells, and some concentration deficits.

R. 15-16 (citations to record omitted). The ALJ also considered the entire record regarding Plaintiff's mental health diagnoses and treatment, as well as the other opinions articulated by the mental health professionals. R. 16-19. Referring to specific and numerous portions of the record, the ALJ noted that

> [t]reatment records also describe her mood and affect as normal, overall, . . . [she] needs no special reminders to manage her medicine, go places, or attend to

13

> personal care needs. Recent and remote memory are noted as intact throughout treatment records. . . . [T]reatment records most often describe the claimant presenting with appropriate mood and affect. . . . But, upon repeated examination, the claimant has presented as alert and fully-oriented with intact cognitive functioning . . . On consultative examination [by Dr. Sexton], the claimant reported problems in this area when she was working but during the evaluation she was able to track the flow of conversation adequately and showed no signs of distraction. She demonstrated only "slight" difficulty in maintaining attention/concentration in performing simple and multi-step tasks. . . . But, as previously discussed, on multiple occasions when receiving treatment, the claimant has exhibited intact mental functioning with appropriate behavior and normal thought content. She also has shown clear indicators of an ability to adapt and manage given that she lives independently and manages her own household, including managing money and performing household chores. [She] is able to arrange her own transportation and engages in an enjoyable activity, even if that activity is just watching television.

*Id.* (citations to record omitted). As is apparent in this summary, the ALJ's consideration of the mental health professionals' opinions effectively addressed both the supportability of those opinions and their consistency with the evidence of record. *See* 20 C.F.R. §§ 404.1520c, 416.920c.

In considering the opinions of the state agency physicians who reviewed the evidence relating to Plaintiff's back impairment, the ALJ's decision, read as a whole, properly considered the supportability of those opinions and the consistency of those opinions with the medical evidence:

> The claimant in this case does have a history of lumbar degenerative disc disease. Imaging of the claimant's back has shown "advanced" or "severe" degenerative changes but these studies do not show evidence of nerve root compression or other neurological involvement, and a lower extremity arterial ultrasound was normal. The claimant's treatment has consisted of conservative measures with oral and topical pain medication and hot/cold compresses. She also has been referred to a neurosurgeon on multiple occasions. Again, conservative treatment was recommended with physical therapy and possible lumbar injections.

R 15 (citations to record omitted).

Plaintiff points to other evidence in the record and argues that the ALJ erred because he *should* have reached different conclusions regarding all these opinions. *Plaintiff's Statement of Errors*, ECF No. 9; *Plaintiff's Reply*, ECF No. 15. But this argument essentially asks this Court to reweigh the evidence. It is the ALJ—not this Court—who is tasked with considering in the first instance all the medical evidence. *See* 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The ALJ did not engage in any prohibited "cherry-picking" of the evidence in this case. Rather, the ALJ's evaluation of the medical evidence reflects the very exercise of discretion vested in ALJs to weight conflicting record evidence. *See White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009) ("But we see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."). *See also DeLong v. Comm'r of Soc. Sec.,* 748 F.3d 723, 726 (6th Cir. 2014) (agreeing that an allegation that the ALJ unfairly "cherry-picked" the record is seldom successful because crediting it would improperly require a court to re-weight record evidence). Plaintiff's contention in this regard is without merit.

**B.     ALJ's Interpretation of Medical Evidence regarding Back Impairment**

A 2018 x-ray of Plaintiff's lumbar spine was read as indicating "[a]dvanced degenerative disc space narrowing and mild-moderate degenerative endplate spurring most marked L4-5 and to lesser extent L3-4 and L2-3", "[a]natomic alignment. No acute abnormality", "[m]ild left lumbar scoliosis", and "[m]ild bilateral degenerative SI joint sclerosis." R. 347. A 2020 CT scan of Plaintiff's lumbar spine was read as indicating "narrowing of intervertebral disks from L2/3 through L4/5. Endplate irregularity and sclerosis noted. Relatively mild to moderate degenerative facet arthropathy at these levels. No osseous destructive lesions. No osseous central or foraminal

15

stenosis." R. 529. In considering Plaintiff's back impairment,[5] the ALJ specifically referred to these studies and found that "[i]maging of the claimant's back has shown 'advanced' or 'severe' degenerative changes but these studies do not show evidence of nerve root compression or other neurological involvement." R. 15. Plaintiff argues that, in making this finding, the ALJ improperly engaged in a prohibited lay interpretation of raw medical data. *Plaintiff's Statement of Errors*, ECF No. 9; *Plaintiff's Reply*, ECF No. 15. To the contrary, however, the expert readings of the x-ray and CT studies made no reference to any nerve root compression or other neurological involvement. The ALJ did not err in making this fact explicit in his decision.

    C.    **Use of Assistive Device**

As noted above, Plaintiff testified that she uses a walker to maintain balance, R. 42, and her primary care provider, Nurse Practitioner Colbert, stated in a July 2019 treatment note that Plaintiff "may use ambulatory aids such as a cane, walker, or crutches. . . ." R. 406. The ALJ acknowledged Nurse Colbert's statement but found it "not persuasive" and did not include in Plaintiff's RFC a need to use an ambulatory aid on the ground that Nurse Colbert's statement "certainly is not an indication that the use of an ambulatory aid is medically necessary." R. 22. Plaintiff complains that this finding failed to comply with the regulations governing the evaluation of medical opinions and, further, that this error was not harmless because the vocational expert testified that the use of a walker would be work preclusive. R. 57.

It is apparent that the ALJ's evaluation of Nurse Colbert's statement was proper. In finding that Nurse Colbert's statement did not demonstrate that the use of a walker was "medically necessary," the ALJ was referring to the standard governing the use of "hand-held

---

[5] Listing 1.04, which addresses disorders of the spine, requires, *inter alia*, a condition that results "in compromise of a nerve root (including the cauda equina) or the spinal cord," as well as neurological involvement. 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 1.04.

16

assistive devices," S.S.R. 96-9p, 1996 WL 374185, at *7 (July 2, 1006), which requires, in pertinent part, as follows:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain, and any other relevant information).

*Id.* at *7. Nurse Colbert's statement that Plaintiff "may" use an assistive device utterly fails to meet this standard. Plaintiff's contention in this regard is without merit.

In short, the Court concludes that the ALJ's decision complied with all governing standards and enjoys substantial support in the record. Under these circumstances, this Court must defer to that decision.

## VI. CONCLUSION

For these reasons, the Court **DENIES** *Plaintiff's Statement of Errors*, ECF No. 9, and **AFFIRMS** the Commissioner's decision.

The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** pursuant to Sentence 4 of 42 U.S.C. § 405(g).

Date: January 6, 2023               *s/Norah McCann King*
                                    NORAH McCANN KING
                                    UNITED STATES MAGISTRATE JUDGE